IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

A.B.D., C.C.S.,

Civ. No. 6:25-cv-02014-AA

Petitioners,

**OPINION & ORDER**

vs.

CAMMILLA WAMSLEY, Seattle Field Office
Director, Immigration and Customs
Enforcement and Removal Operations
("ICE/ERO"); TODD LYONS, Acting
Director of Immigration and Customs
Enforcement ("ICE"); U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
KRISTI NOEM, Secretary of the
Department of Homeland Security ("DHS");
U.S. DEPARTMENT OF HOMELAND
SECURITY; PAMELA BONDI, Attorney
General of the United States,

Respondents.

_____

AIKEN, District Judge:

Before the Court is a Petition for Writ of Habeas Corpus, ECF No. 1. After
reviewing the filings, the Court determined that the petition could be decided as a
matter of law and that an evidentiary hearing was not required. *See* 28 U.S.C. § 2243
("Unless the application for the writ and the return present only issues of law the
person to whom the writ is directed shall be required to produce at the hearing the
body of the person detained."); *see also Farquharson v. Landon*, 217 F.2d 603, 604
(9th Cir. 1954) (no requirement to produce additional testimony or bring the

petitioner into court where "uncontroverted facts" were found in the record and "[no] other questions than the law to be applied remained"). For the reasons explained below, the Court GRANTS the petition for a writ of habeas corpus as to A.B.D. and C.C.S., ECF No. 1.

## BACKGROUND

Petitioners A.B.D. and C.C.S. (collectively, "Petitioners") are members of a Guatemalan community who speak an indigenous language, Mam. Petitioners have no understanding of English and only a basic understanding of Spanish.[1] A.B.D. Decl. ¶¶ 2, 11, ECF No. 19; C.C.S. Decl. ¶¶ 5, 13, ECF No. 20. A.B.D. attests that "[he] ha[s] trouble reading and writing because [he] did not go to very much school." A.B.D. Decl. ¶ 19. Petitioners are farmworkers who have lived without legal status in Oregon since 2023. A.B.D. Decl. ¶ 3; C.C.S. Decl. ¶¶ 3–4. Neither Petitioner has a criminal history. *Id.*

On October 30, 2025, Petitioners were riding in a shared van to work and were pulled over by ICE. A.B.D. Decl. ¶¶ 4–5; C.C.S. Decl. ¶¶ 5–6. The parties do not dispute that Petitioners were arrested without a warrant. The parties do not dispute that at no time did Petitioners seek to flee or in any way resist arrest. A.B.D. Decl. ¶ 7; C.C.S. ¶ 8; Holani Decl. ¶¶ 5–11, ECF No. 12. The parties do not dispute that at no time during the arrest or later detainment did Respondents provide a Mam interpreter. The parties do not dispute that ICE officers did not make an

---

[1] Petitioners' declarations were translated into English from Mam by an interpreter. *See* A.B.D. Decl. at page 5; C.C.S. Decl. at page 5.

individualized assessment of each Petitioners' flight risk as required to make a warrantless arrest under 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii). Officer Holani attests that "[her] fellow officers and [she] had probable cause to arrest [Petitioners]" because Petitioners "admitted they were unlawfully present in the United States and had no legal status here." *Id.* ¶ 12. The parties do not dispute that, at some time on October 30 or October 31, Respondents issued to each Petitioner a Notice to Appear ("NTA") that was written in English and which initiated removal proceedings. Holani Decl. ¶¶ 17, 22; Ex. C (A.B.D.'s NTA), ECF No. 13-3; Ex. E (C.C.S.'s NTA), ECF No. 13-5.

After Petitioners were arrested, they were briefly detained at the Portland Detention Facility and then transported out of Oregon to the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington. Holani Decl. ¶¶ 15 (A.B.D.), 20 (C.C.S.).

On October 31, 2025, Petitioners were released from NWIPC on Orders of Release on Recognizance. *Id.* ¶¶ 15 (A.B.D.), 20 (C.C.S.). To be released, Petitioners believed that they would have to "sign papers [they] did not understand[,]"and because they "wanted to be released," they signed the papers. A.B.D. ¶ 16; C.C.S. ¶ 18. At no time did Petitioners appear before an immigration judge. ICE officers then placed ankle monitors on each of the Petitioners and entered them into ICE's Intensive Supervision Appearance Program ("ISAP").

A.    *Petitioner A.B.D.*

Petitioner A.B.D. attests, that on October 30, 2025, at about 5:00 am, when the passenger van in which Petitioners were riding to work was stopped, ICE officers "made all the passengers get out[.]"  A.B.D. Decl. ¶¶ 3–6.  "[He] was sitting in the back, and it was still dark, [so] [he] couldn't hear or see everything[,]" but when he "heard some of the women start to cry[,]" he "realized [they] were being arrested."  *Id.* ¶ 6.  "[He] was scared and confused" but "got out of the van like they told [him] to" and "did not try to run away or resist."  *Id.* ¶ 7.  He also attests that "officers did not ask [his] name, about [his] immigration status, or tell [him] why [he] was being arrested[,]" and "did not give [him] any paperwork[]."  *Id.* ¶ 8.  The ICE officers "put handcuffs and ankle shackles on [him,]" and "put everyone into their [ICE] van[,]" but "did not tell [them] where they were taking [them]."  *Id.* ¶ 9.  "[W]ith [his] hands and feet bound," the officers "took [his] picture[,]" and from the picture "they knew who [he] was[,]" "said [his] full name" and "asked if that was [him.]"  *Id.* ¶ 10.  He said yes.  *Id.*

A.B.D. attests that he was taken to the Portland ICE Detention Center, "placed in a cell with other men[,]" and that officers "took [his] fingerprints[,]" but because they "only spoke to [him] in Spanish," "[he] could not fully understand what they told [him.]"  *Id.* ¶ 11.  He "tried to tell them [he] speak[s] Mam," but "was never given a Mam interpreter."  *Id.*  He attests that, to his knowledge, the officers "did not tell [him] about [his] rights" and that "[he] did not know [he] had the right to talk to an attorney, so [he] did not ask for one[.]"  *Id.* ¶ 12.  "[T]he officers brought [him] to a

room with two lawyers[]" for "a very short meeting, only about five minutes[,]" but "it was hard to understand [the attorneys]" without a Mam interpreter because "[t]hey only spoke Spanish[.]" *Id.* ¶ 13.

A.B.D. was put on a bus while "still physically restrained" and "taken to Tacoma[.]" *Id.* ¶¶ 14–15. He spent the night in the Tacoma Detention Center and was released the next day but "[t]hey had [him] sign papers [he] did not understand [and] put a GPS tracking monitor on [his] ankle[.]" *Id.* ¶ 16.

On November 5, 2025, Petitioner went to his first ISAP appointment in Portland with his attorney, who "asked [the ICE officer] if they c[ould] take the ankle monitor off[.]" *Id.* ¶ 17. "[T]he ICE officer told [them] that if [A.B.D.] gave them [his] passport, they would most likely remove [his] ankle monitor at the ISAP office that day[,]" so A.B.D. "promptly gave them [his] passport, trying to do everything [he] could to comply[,]" but they did not remove the ankle monitor. *Id.* A.B.D. "told them how much pain it was causing [him], but they told [him] there was nothing they could do and they did not even adjust it." *Id.*

On November 19, 2025, A.B.D. went to his second ISAP appointment in Portland. *Id.* ¶ 18. He told the case specialist about his problems with the ankle monitor, that when he "wear[s] tall work boots that come up to [his] calf," the monitor turns his leg red "and hurts terribly." *Id.* Petitioner was told that they could not remove the monitor until ICE gave permission and that "[he] w[ould] probably have to wait six months before they w[ould] consider removing it, even though [he] ha[d] done everything they asked [him] to[.]" *Id.* Petitioner surrendered his passport and

traveled from Woodburn three times in one month, even though "[he] cannot drive and do[es] not have a car, so travelling to Portland for [his] appointments is very hard[.]" *Id.*

A.B.D. attests that he also has ISAP appointments through an ICE phone app and that "[he] ha[s] to be alert all the time for a call that could be anytime between 6:00 in the morning to 7:00 at night[.]" *Id.* ¶ 19. "[He] cannot leave [his] house until [he] receive[s] their call." *Id.* The app is "very confusing" for him, and "[he] often ha[s] trouble logging in unless someone helps [him]" because he has a long password and because he has "trouble reading and writing." *Id.* He is "afraid that if something is wrong with [his] phone, and [he] miss[es] their call somehow, they will arrest [him] again." *Id.*

B.    *Petitioner C.C.S.*

Petitioner C.C.S. attests that, on October 30, 2025, when the van was pulled over, she "was sitting in the second row of seats behind the driver[,]" that "a group of officers came up and surrounded the van, some yelling in English and some in Spanish[,]" and that "[she] heard one of the officers say that [they] were being detained by immigration and that [they] all had to get out of the van." C.C.S. Decl. ¶ 7. C.C.S. "was very afraid[,]" and "[w]hen the officers opened the door, they told [her] to get out[,]" and "[she] got out and did not try to run or resist." *Id.* ¶ 8. "[T]he officers lined [them] up against the wall and started to interrogate [them.]" *Id.* ¶ 9. "An officer handcuffed [her] and put [her] in a car[]" and took them to Portland. *Id.* ¶¶ 9–10.

C.C.S. attests that at the Portland Detention Center, "the officers did not ask [her] anything[,]" "[she] was held in a cell with other women[,]" that they were taking them one by one, and that "[w]hen [her] turn came, they just put [her] hand on a machine to take [her] fingerprints" but "still never even asked [her] name" or "provide[d] [her] with any document or explained the reason why [she] was detained." *Id.* ¶ 11. "At some point, . . . the officers took [her] out [of the cell] and led [her] to a room where [she] met with two lawyers[,]" but "the meeting was very fast so [she] was not able to explain very much[]" and "could not fully understand everything because it was hard to hear through the plastic barrier between [them], and the conversation was in Spanish[.]" *Id.* ¶¶ 12–13. C.C.S. "was brought back to speak with the lawyers a couple hours later" for "a short conversation and [she] confirmed that [she] wanted the lawyers to help [her]." *Id.* ¶ 14.

C.C.S. attests that she was then taken to the Tacoma Detention Center. *Id.* ¶ 15. "[She] was very confused and scared about what was going to happen." *Id.* ¶ 16. She was released the next day but "[t]hey had [her] sign a bunch of papers in English that they said were about being released[,]" and even though "[she] did not know what they all said[,]" "[she] wanted to be released so [she] signed them." *Id.* ¶ 18. "They also put an ankle monitor on [her] before [she] was let go." *Id.* She attests that "[i]t has been very difficult since being released from detention[,]" that "the ankle monitor is painful and has made it hard for [her] to live [her] daily life[,]" and that "[she is] also afraid that [she] will be detained again, or if not [her], one of [her] friends or family." *Id.* ¶ 19. She cries every day. *Id*

C.    *Declaration of ICE Officer Holani*

Respondents submitted the declaration of ICE Officer Holani who was in fact not present when the other ICE officers at the scene conducted "field interviews" of Petitioners.  Holani Decl. ¶¶ 6–7.  Respondents do not dispute that neither A.B.D. nor C.C.S. resisted arrest or tried to flee.

Holani attests that on October 30, 2025, around 5:18 a.m., she and her partner "encountered" a "passenger van" in Marion County and ran the license plate of the vehicle through "immigration and criminal databases[,]" to discover that "the registered owner of the van was an unlawful immigrant subject to a prior expedited removal order from the United States[.]"  *Id.* ¶ 3.  "[Holani] and [her] partner conducted a stop of the vehicle[.]"  *Id.*  "[She] observed [her] partner ask the driver of the van . . . for his name and . . . confirmed his identity."  *Id.* ¶ 4.  Her partner handcuffed the driver with "the intent to arrest him."  *Id.*  Holani approached the front passenger side of the vehicle, opened the door, and asked the front seat passenger to identify herself.  *Id.*  Holani attests that both the driver and the front seat passenger "fled the scene and started running away in the dark" while the other van passengers, including Petitioners, stayed at the van.  *Id.* ¶ 6.

Holani and her partner chased the two fleeing individuals.  *Id.*  But before giving chase, Holani attests that she and her partner "observed that there were approximately ten other individuals located in the back of the van, several of whom were retrieving their cameras, filming us, moving rapidly, reaching for their backpacks and appearing agitated . . . while it was pitch dark in the van."  *Id.* ¶ 5.

"Believing the situation to be incredibly unsafe, [they] asked the passengers to stop moving about and reaching for the contents of their backpacks[] and gave them commands in Spanish to cease doing so, but they did not heed [their] warnings." *Id.* Holani and her partner gave commands to the passengers "to stop in English and Spanish," and called for backup, which arrived. *Id.*

Holani attests that Petitioners and the other van passengers "remained at the van" with the other ICE officers while she and her partner chased the fleeing van driver and front seat passenger. *Id.* ¶ 6. After she left the scene, "other [ICE] Officers conducted field interviews of the remaining passengers, including . . . A.B.D. and C.C.S." *Id.* ¶ 7. Holani attests that "[e]very single passenger in the van, including Petitioners A.B.D. and C.C.S., consensually and voluntarily disclosed to the ERO Officers on the scene that they were citizens of foreign countries and that they had no legal basis to be present in the United States." *Id.*

She also attests that "[a]t no point during the encounter did [they] hear Petitioners A.B.D. or C.C.S., or any other passenger in the van, ask for an attorney[,]" and "at no time during the encounter did [they] hear Petitioners A.B.D. or C.C.S., or any other passenger in the van, express any fear of returning to their country of origin or request a fear interview from an immigration court." *Id.* ¶ 8. "After it was conclusively determined through their own consensual admissions that all of the individuals in the van were unlawfully present in this country, the driver and all of the passengers were handcuffed" and transported to the Portland ICE facility. *Id.* ¶¶ 8–9. Holani contends that "[e]ven if [they] had not received the above-referenced

information through a consensual encounter[,]" she had "reasonable suspicion to question each of the passengers about their citizenship" because the van's license plate was registered to a noncitizen without lawful status, "the suspicious behavior of the passengers," two individuals fled, and "the passengers would not listen to [their] commands to cease reaching into their backpacks and navigating towards the front of the van in the pitch dark." *Id.* ¶ 11.  Holani then contends that "[o]nce all of the passengers admitted they were unlawfully present in the United States and had no legal status here, [her] fellow officers and [she] had probable cause to arrest them[.]" *Id.* ¶ 12.

## LEGAL STANDARD

A writ of habeas corpus is "available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. CONST. art. I, § 9, cl. 2).  Under 28 U.S.C. § 2241, federal district courts "within their respective jurisdictions" have the authority to hear applications for habeas corpus by any person who claims to be held "in custody in violation of the Constitution or laws or treaties of the United States."  The "essence of habeas corpus is an attack by a person in custody upon the legality of that custody." *Prieser v. Rodriguez*, 411 U.S. 475, 484, 489 (1973).  Habeas corpus "entitles [a] prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." *Boumediene v. Bush*, 553 U.S. 723, 779 (2008) (quoting, *INS v. St. Cyr*, 533 U.S. 289, 302 (2001)).

The federal habeas corpus statute "does not limit the relief that may be granted to discharge of the applicant from physical custody." *Carafas v. LaVallee*, 391 U.S. 234, 239 (1968); *see also Peyton v. Rowe*, 391 U.S. 54, 66–67 (1968) ("[I]mmediate physical release [is not] the only remedy under the federal writ of habeas corpus."). "Its mandate is broad with respect to the relief that may be granted." *Carafas*, 391 U.S. at 239. "Since 1874, the habeas corpus statute has directed the courts to determine the facts and dispose of the case summarily, 'as law and justice require.'" *Peyton*, 391 U.S. at 66–67 (quoting Rev. Stat. § 761 (1874) superseded by 28 U.S.C. § 2243); *see also Trump v. J. G. G.,* 604 U.S. 670, 672 (2025) (same).

## DISCUSSION

Petitioners challenge the legal basis of their custody. Petitioners allege that they were unlawfully detained in contravention of their Fifth Amendment procedural due process rights, Pet. ¶¶ 82–86, and that they were unlawfully arrested without a warrant or probable cause in violation of the warrantless arrest provisions of the Immigration and Nationality Act ("INA") and in violation of the Administrative Procedure Act, 5 U.S.C. § ¶ 706(2), *id.* ¶¶ 58–75, the *Accardi* Doctrine, *id.* ¶¶ 76–81, and the Fourth Amendment, *id.* ¶¶ 51–57.

Respondents contend that the Court lacks subject matter jurisdiction to review Petitioners' habeas claims, Resp. at 8, ECF No. 11; that Petitioners' habeas claims are moot because "Petitioners were released from DHS custody[,]" *id.* at 1, 8; that Petitioners' Fifth Amendment claims fail because "due process claims arising from removal proceedings should be raised in the immigration forum[,]" *id.* at 21; that

Petitioners' warrantless arrest claims under the APA fail because "claims that fall within the 'core' of the writ of habeas corpus . . . must be brought in habeas and not under the Administrative Procedure Act[,]" *id.*; and that Petitioners' Fourth Amendment claims fail because "Officer Holani . . had reasonable suspicion to pull the van over and question the inhabitants[,]" and A.B.D. and C.C.S "agreed to provide" their names and country of citizenship when the ICE Officers asked them for that information, *id.* at 16. Respondents also contend that they detain Petitioners under 8 U.S.C. § 1225(b)(2).

I.   *The Court has Jurisdiction*

Respondents issued Notices to Appear ("NTAs") to Petitioners at some time on either October 30, 2025, or October 31, 2025. Respondents now maintain that "all claims" by Petitioners, including claims as to their ankle monitors and mandatory check-ins, are "inextricably linked" to their removal proceedings and, that, 8 U.S.C. §§ 1252(g) and 1252(b)(9) thus strip this Court of jurisdiction to review Petitioners' habeas petitions. Resp. at 9–10. Section 1252(g) provides that

> no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, *or execute removal orders* against any alien[.]

8 U.S.C. § 1252(g) (emphasis added). Respondents maintain that section 1252(g) bars this Court "from questioning ICE's discretionary decisions to commence removal" and "detain [Petitioners] during [their] removal proceedings[.]" Resp. at 9 (quoting *Alvarez v. U.S. Immigr. & Customs Enf't*, 818 F.3d 1194, 1203 (11th Cir. 2016)).

Respondents also cite 8 U.S.C. § 1252(b)(9), which provides that:

> [j]udicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order[.]

8 U.S.C. § 1252(b)(9). Respondents contend that this provision, together with § 1252(a)(5)—which vests judicial review of such final orders exclusively with the appeals courts—bar this Court from reviewing the petitions here. Resp. at 9–10.

Contrary to the Government's assertions, the jurisdiction-stripping provisions of §§ 1252(g) and 1252(b)(9) do not apply here. Petitioners are not challenging the removal proceedings; they are challenging the legality of their detentions, and, by extension, the "alternatives to detention," by which Petitioners still remain in custody, as discussed below. "By virtue of their explicit language, both §§ 1252(a)(5) and 1252(b)(9) apply only to those claims seeking judicial review of orders of removal." *Singh v. Gonzales*, 499 F.3d 969, 978 (9th Cir. 2007). The binding authorities have instructed that "treating everything related to and leading up to removal proceedings as 'arising from' a removal action is an incorrect reading of the relevant statutes." *Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 884 (C.D. Cal. 2025) (citing *Jennings v. Rodriguez*, 583 U.S. 281, 292–93, (2018), *U.S. Dep't of Homeland Sec. v. Regents of Univ. of California*, 591 U.S. 1, 19 (2020), *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 810 (9th Cir. 2020)).

As to section 1252(g), the Supreme Court has directed that its jurisdiction-stripping provision be narrowly construed and limited to "three discrete actions:" the "'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999)

(emphasis in original) (quoting 8 U.S.C. § 1252(g)).  The Court rejected any reading of the statute that would cover "the universe of deportation claims," *id.*, and cautioned against interpreting § 1252(g) with "uncritical literalism" "to sweep in any claim that can technically be said to 'arise from' the three listed actions."  *Jennings*, 583 U.S. at 293–94 (2018).

Instead, "the proper jurisdictional analysis under Section 1252(g) focuses on the government action or decision that gives rise to the plaintiff's claims, not whether the plaintiff's claims might affect or preclude removal."  *Sepulveda Ayala v. Bondi¸* 794 F. Supp. 3d 901, 908 (W.D. Wash. 2025) (quoting *Arce v. United States*, 899 F.3d 796, 799–800 (9th Cir. 2018)).   Detention decisions are not among the three discretionary acts rendered unreviewable by section 1252(g).  *Ibarra-Perez v. United States*, 154 F.4th 989, 996 (9th Cir. 2025) ("[A]ssertions of illegal detention [are] plainly collateral to ICE's prosecutorial decision to execute [a] removal.").   And "§ 1252(g) does not prevent the district court from exercising jurisdiction over the plaintiffs' due process claims" because the due process claims "[do] not arise from a 'decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien,' but instead constitute general collateral challenges to unconstitutional practices and policies used by the agency." *Id.* at 998 (cleaned up) (quoting 8 U.S.C. § 1252(g)).

Section 1252(b)(9), likewise, "does not bar claims that are 'independent of or collateral to the removal process[,]'" including challenges to the manner in which an individual is first arrested and detained.  *Rodriguez v. Bostock*, ___ F. Supp. 3d ___,

No. 3:25-CV-05240-TMC, 2025 WL 2782499, at *9 (W.D. Wash. Sept. 30, 2025) (quoting *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016) and citing *Jennings*, 583 U.S. at 293). "The Supreme Court has . . . instructed that § 1252(b)(9) is a 'targeted' and 'narrow' provision that 'is certainly not a bar where . . . the parties are not challenging any removal proceedings.'" *Gonzalez*, 975 F.3d at 810 (quoting *U.S. Dep't of Homeland Sec. v. Regents*, 591 U.S. at 19).

Further, Respondents' broad interpretation of the INA's jurisdiction-stripping provisions raises serious Suspension Clause concerns. The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. CONST. art. I, § 9, cl. 2. "While Congress may modify the right to seek the writ under certain circumstances, it may not do so without providing 'a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention.'" *Sepulveda*, 794 F. Supp. 3d at 908 (quoting *Swain v. Pressley*, 430 U.S. 372, 381 (1977)).

Here, Respondents' broad interpretation of the INA's jurisdiction-stripping provisions would leave Petitioners with no remedy to challenge the legality of their detentions. Other courts have raised similar concerns. *See Ozturk v. Trump*, 779 F. Supp. 3d 462, 482–87 (D. Vt. 2025) (considering whether Congress had provided ICE detainees with sufficient substitute remedy for habeas); *Mohammed H. v. Trump*, 786 F. Supp. 3d 1149, 1155 (D. Minn. 2025) ("The [jurisdiction stripping] statutes cannot be stretched so far that they entirely preclude any habeas jurisdiction over

constitutional challenges to immigration detention."). Federal courts should decline to construe acts of Congress "in a manner that could in turn call upon the Court to resolve difficult and sensitive [constitutional] questions[.]" *Neal v. Bd. of Trustees of Cal. State Univs.*, 198 F.3d 763, 772 (9th Cir. 1999) (internal quotation marks omitted) (quoting *NLRB v. Cath. Bishop of Chicago*, 440 U.S. 490, 507 (1979)). The constitutional avoidance canon thus also supports this Court's narrow interpretation of sections 1252(g) and 1252(b)(9).

In sum, the jurisdiction-stripping provisions of sections 1252(g) and 1252(b)(9) do not apply here because Petitioners do not challenge the removal proceedings, they challenge the legality of their detentions. For that reason, this Court has jurisdiction to review Petitioners' habeas claims including the claims as to their ankle monitors and mandatory check-ins.

II.    *Petitioners' Habeas Claims Are Not Moot*

Respondents argue that Petitioners' habeas claims are now moot because "Petitioners were released from DHS custody on Friday, October 31, 2025[]" and are no longer "in custody." Resp. at 8 (quoting 28 U.S.C. § 2241(c)(3)).

Under 28 U.S.C. § 2241(c)(3), federal courts have authority to grant writs of habeas corpus to individuals "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). But "custody" is not limited to physical imprisonment. A court may afford habeas relief to an individual, who, as here, is subject to "restraints not shared by the public generally." *Jones v. Cunningham*, 371 U.S. 236, 240 (1963); *see also Munoz v. Smith*, 17 F.4th 1237, 1241

(9th Cir. 2021) (quoting *Jones*, 371 U.S. at 242, and holding that custody "encompass[es] circumstances in which the state has imposed 'significant restraints on [a] petitioner's liberty'"); *Nowakowski v. New York*, 835 F.3d 210, 217 (2d Cir. 2016) (quoting *Jones*, 371 U.S. at 240, and explaining that restrictions that "require [petitioner's] physical presence at particular times and locations, both for community service and court appearances," and which "carry with them the potential for future adverse consequences during the term of the sentence, including arrest for noncompliance and modification or revocation of the conditional discharge" constitute custody because such restrictions are "'not shared by the public generally'").

Here, Petitioners were released from their imprisonment with ankle monitors and were enrolled without their knowledge in ICE's Intensive Supervision Appearance Program, ISAP. Petitioners attest that the monitors are painful and make it difficult to live and to work. A.B.D. Decl. ¶¶ 17, 18; C.C.S. Decl. ¶¶ 18, 19. A.B.D. attests to significant pain when he wears the ankle monitor with his work boots, that he informed ICE officers about this condition, and that ICE declined to even adjust the monitor—after leading him to believe that they would remove or adjust the monitor if he gave them his passport, which he did. A.B.D. Decl. ¶¶ 17, 18. A.B.D. attests that ICE told him that he would have to wear the monitor for at least six months before ICE would consider removing it. *Id.* ¶ 18. Petitioners must attend frequent mandatory in-person appointments in Portland. A.B.D. was required to appear at three ICE appointments in Portland in a month's time, which was difficult for him to do because he does not live in Portland, does not have

transportation, and he cannot drive. *Id.* ¶¶ 17–19. Further, A.B.D. cannot leave his house until, each day, at a random and arbitrary time between 6 am and 7 pm, ICE "calls" him through a phone app. *Id.* ¶ 19. Every day, A.B.D. has to seek help from someone else to log into the app because he does not know English, understands little Spanish, has to enter a long password, and is semi-illiterate. *Id.* A.B.D. and C.C.S. attest that ICE has seized vast control over their lives, which causes them to live in daily fear of unintentionally violating their release conditions and being re-detained. A.B.D. ¶¶ 17–20; C.C.S. ¶ 19.

The Court concludes that, by these "intensive supervision" and monitoring measures, which carry with them the potential for future adverse consequences for noncompliance, ICE controls Petitioners' daily lives and thus subjects them to significant restraints that are not shared by the public generally. *See Orellana Juarez v. Moniz*, No. 25-cv-11266-MJJ, 2025 WL 1698600, at *4 (D. Mass. June 11, 2025) ("conditions of release" that include a 24/7 GPS ankle monitor, enrollment in intensive supervision program, ISAP, required regular reporting to ICE, allowing ICE to enter petitioner's residence at home visits, a 10 PM curfew, and geographic restrictions on travel determined to be "analogous" to the parole conditions in *Jones*, 371 U.S. at 242); *see also Hogarth v. Santacruz*, No. 5:25-CV-09472-SPG-MAR, 2025 WL 3211461, at *13 (C.D. Cal. Oct. 23, 2025) ("conditions of release" that included electronic monitoring and "multiple check-ins with ICE every month" were "sufficient to demonstrate that [the petitioner] is in custody"); *Meysam Khabazha, v. United States Immigration and Customs Enforcement*, No. 25-CV-5279 (JMF), 2025 WL

3281514, at *3 (S.D.N.Y. Nov. 25, 2025) ("conditions of release" including requirements that petitioner "wear an ankle monitor at all times" and "check in at regular intervals[,]" "render[ ] him 'in custody' for purposes of his habeas petition"); *Alma Martinez Cruz v. Lyons*, No. 5:25-CV-02879-MCS-MBK, 2025 WL 3443146, at *3 (C.D. Cal. Dec. 1, 2025) ("the imposition of additional constraints on [the] [p]etitioner's liberty following her detention, including electronic monitoring, supports a conclusion that she remains in custody").

Accordingly, the Court determines that Respondents, by self-described "intensive supervision" measures, continue to maintain custody of Petitioners and that Petitioners may seek and be granted habeas relief from the on-going restraints on their liberty.

III.    *Section 1225(b)(2) Does Not Authorize Petitioners' Detention*

In their initial filings, Respondents fail to disclose the statutory authority by which they detain (and maintain custody of) Petitioners. After the Court requested this information, Respondents provided that 8 U.S.C. § 1225(b)(2) authorizes them to detain Petitioners. *See* ECF No. 24. But § 1225(b)(2) applies to noncitizens who "are seeking" admission into the U.S. at the time of arrest, not to noncitizens who already reside in the U.S. at the time of arrest. Section 1225(b)(2), titled "Inspection of other aliens," provides that "if the examining immigration officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained[.]" 8 U.S.C. § 1225(b)(2) (emphasis added). Section 1225(b)(2) does not apply to Petitioners because they were not "seeking admission" to the U.S. at the

time of arrest—they have been living in the U.S. for several years.  Section 1225(b)(2) thus does not provide Respondents any authority to detain (and maintain custody of) Petitioners.  For this reason, the Court grants Petitioners' habeas relief.

Further, it is § 1226, not § 1225, that authorizes the government "to detain certain aliens already in the country pending the outcome of removal proceedings[.]" *Jennings*, 583 U.S. at 289.  Section 1226(a)'s "default rule" permits—but does not require—the Attorney General to issue warrants for the arrest and detention of noncitizens pending the outcome of their removal proceedings.  *Id.* at 288.  And, unlike the mandatory detention that § 1225 requires, detention under § 1226 is discretionary.  Further, § 1226 provides that detainees must "receive bond hearings at the outset of [that] detention."  *Id.* at 306 (citing 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1)).  It should be noted that § 1226 itself excepts from its due process protections certain subcategories of noncitizens who are residing in the U.S. at the time of arrest, notably "criminal aliens" under 1226(c) and other subcategories recently added by the Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025).  Petitioners do not fall into any of the subcategories that are excepted from due process protections.

This Court agrees with the dozens of courts in this circuit and across the country that have examined the text, context, prior agency application, and legislative history of § 1225(b)(2) and concluded that § 1225 applies only to noncitizens "seeking admission" to the U.S. at the time of arrest, not to noncitizens who already reside in the U.S. at the time of arrest.  *See*, *e.g.*, *Rodriguez*, 2025 WL

2782499, at *2–3 (W.D. Wash. Sept. 30, 2025) (providing a meticulous analysis of the INA's two detention authorities, § 1225 and § 1226, and concluding that § 1225, which mandates detention without hearing, applies to certain noncitizens who are "seeking admission" to the U.S. at the time of arrest and that § 1226, the "default" rule, applies to noncitizens who already reside in the U.S. at the time of arrest with some exception as provided by the § 1226(c) "carve out" and the Laken Riley amendments); *see also Gomes v. Hyde*, ___ F. Supp. 3d ___, No. 1:25-CV-11571-JEK, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025) ("[T]he plain text of Sections 1225 and 1226, together with the structure of the larger statutory scheme, indicates that Section 1225(b)(2) does not apply to noncitizens who are arrested . . . while residing in the United States."); *Martinez v. Hyde*, 792 F. Supp. 3d 211, 218, 214 (D. Mass. 2025) (noting that the government's "novel interpretation [of § 1225] would require the detention of millions of immigrants currently residing in the United States;" and explaining that "for section 1225(b)(2)(A) to apply, several conditions must be met—in particular, an 'examining immigration officer' must determine that the individual is: (1) an 'applicant for admission;' (2) 'seeking admission;' and (3) 'not clearly and beyond a doubt entitled to be admitted;'" and rejecting the application of § 1225 to noncitizens already residing in the U.S. because, among other things, it negates the plain meaning of "seeking admission"); *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 486–87 (S.D.N.Y. 2025) ("Section 1225 . . . clearly does not apply to someone who has resided in the country for two years like [petitioner.]"); *Salcedo Aceros v. Kaiser*, No. 25-CV-06924-EMC (EMC), 2025 WL 2637503, at *10–12 (N.D. Cal. Sept. 12, 2025)

(rejecting the government's "expansive view" of § 1225 as counter to the text's plain language, the section's position in the "overall statutory scheme" and explaining that the government's interpretation would "nullify" the 2025 Laken Riley Act).

This Court similarly rejects Respondents' novel and expansive interpretation of § 1225 as counter to the text's plain language, its place in the overall statutory scheme, prior agency application, and legislative history. Respondents' attempt to impose mandatory detention without hearing on noncitizens who already reside in the U.S. at the time of arrest not only renders § 1226 meaningless but also guts the due process guarantees that protect noncitizens and citizens alike from reckless and erroneous deprivations of liberty.

In sum, because 8 U.S.C. § 1225 does not apply to Petitioners and thus does not authorize Respondents to detain Petitioners, the Court grants the writ of habeas corpus to A.B.D. and C.C.S.

IV.    *Petitioners' Detention Violates the Due Process Clause*

Petitioners assert that Respondents violate their Fifth Amendment due process rights by subjecting them to on-going custody without procedural due process. The Due Process clause prohibits deprivations of life, liberty, and property without due process of law. U.S. CONST. amend. V. "The fundamental requirement of [procedural] due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (internal citation and quotation marks omitted). Procedures that protect individuals "from official mistakes and mistreatment is the hallmark of due process." *Rumsfeld v.*

*Padilla*, 542 U.S. 426, 465 (2004) (Stevens, J., dissenting).  These protections extend to noncitizens present in the United States.  *See J.G.G.*, 604 U.S. at 673 (per curiam) ("It is well established that the Fifth Amendment entitles aliens to due process of law in the context of removal proceedings.") (internal citation and quotation marks omitted); *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.").

To determine whether the government has provided sufficient procedural due process to deprive an individual of life, liberty, or property, courts consider three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguard;" and (3) "the [g]overnment's interest, including . . . the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews*, 424 U.S. at 335.  The Ninth Circuit has "assume[d] without deciding" that *Mathews* applies in the immigration detention context.  *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206–07 (9th Cir. 2022); *see also Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1033 n.2 (N.D. Cal. Jul. 24, 2025) (collecting cases in which the Ninth Circuit applied *Mathews* in the immigration context).

As to the first *Mathews* factor, Petitioners have protected liberty interests.  "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause

protects." *Zadvydas*, 533 U.S. at 690. "Even those who face significant constraints on their liberty or those over whose liberty the government wields significant discretion retain a protected interest in their liberty." To protect that interest, a noncitizen detained under § 1226(a), the proper detention authority in this case, must "receive [a] bond hearing[] at the outset of detention." *Jennings*, 583 U.S. at 306 (citing 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1)). 8 C.F.R. § 236.1(c)(8) provides such detainee the opportunity to appear before a neutral decision maker to show that the detainee "would not pose a danger to property or persons" and is "likely to appear for any future proceeding." 8 C.F.R. § 236.1(c)(8). Absent flight risk or danger to the community, "§ 1226[a] contemplates parole or conditional release." *Pichardo Medina v. Hermosilla*, No. 3:25-CV-02233-MC, 2025 WL 3712271, at *3 (D. Or. Dec. 22, 2025) (citing *Zadvydas*, 533 U.S. at 683, 690–92). "If denied release at the initial bond hearing, a § 1226(a) detainee may request a custody redetermination hearing before an IJ." *Borbot v. Warden Hudson Cnty. Corr. Facility*, 906 F.3d 274, 275 (3d Cir. 2018) (citing 8 C.F.R. § 236.1(d)(1)). Congress thus recognized that noncitizens detained under Section 1226(a) have liberty interests and are entitled to due process sufficient to protect those interests. The first *Mathews* factor strongly favors Petitioners.

As to the second *Mathews* factor, the risk of erroneous deprivation "through the procedures used" here is great. *Mathews*, 424 U.S. at 335. The parties do not dispute that no procedures were used. Petitioners have not been afforded any pre-deprivation notice or hearing and are subject to on-going custody. "The risk of

erroneous deprivation becomes overwhelmingly high when immigration officers act with unrestrained discretion to detain noncitizens without an individualized showing of why detention is warranted or an effective process for noncitizens to challenge the exercise of such discretion." *Pichardo Medina*, 2025 WL 3712271, at *4. For this reason, the second *Mathews* factor strongly favors Petitioners.

As to the third *Mathews* factor, the government's burden of providing sufficient (and lawful) procedures as to Petitioners' detention, including the burden of any administrative and financial costs, is not great. *Mathews*, 424 U.S. at 335. Although "the government clearly has a strong interest in preventing [noncitizens] from remain[ing] in the United States in violation of [U.S.] law[,]" *Rodriguez Diaz*, 53 F.4th at 1208, that interest is not implicated here because, regardless of whether Petitioners are detained, Petitioners still remain subject to on-going removal proceedings. Respondents provide no evidence that Petitioners are a flight risk or pose a danger to the community. The undisputed facts show that Petitioners do not, in fact, pose a flight risk or a danger to the community. Petitioners have lived in Oregon for two years and have no criminal history or history of immigration violations. They lack the communication and financial resources to support flight. They are employed as farmworkers. And they live in a community with other Indigenous Guatemalans, a community with Mam-speaking friends and family. C.C.S. ¶ 19. Finally, Petitioners fully cooperated with the ICE officers, once they were able to understand what the ICE officers had ordered.

The Court concludes that "[t]he effort and cost required to provide Petitioner[s] with procedural safeguards is minimal[.]" *Doe v. Becerra*, 787 F. Supp. 3d 1083, 1094 (E.D. Cal. 2025). In contrast, the wholesale detention of noncitizens, as here, is not only unlawful—which undermines the government's paramount interest in complying with its own laws—but also adds to a mounting financial burden. "The costs to the public of immigration detention are staggering." *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (internal quotation marks omitted). Though "[s]upervised release programs cost much less by comparison[,]" *id.*, here, Respondents' "intensive supervision" measures, which include 24/7 GPS ankle monitoring and unreasonably frequent ICE check-ins in person and by phone app, unnecessarily add to the costs to such programs. The third *Mathews* factor strongly favors Petitioners.

In sum, Respondents deprived Petitioners of their liberty interests under the Fifth Amendment by holding them in custody with intensive supervision measures without pre-deprivation notice and hearing.

V.    *Petitioners' Warrantless Arrests were Unlawful*

Petitioners allege that their warrantless arrests violated the Fourth Amendment, the INA, and the APA. Pet. ¶¶ 51–81.

The parties do not dispute that Petitioners were arrested without warrants. Respondents contend that ICE officers effected lawful warrantless arrests because "Officer Holani . . had reasonable suspicion to pull the van over and question the inhabitants" and "A.B.D. and C.C.S were asked for their names and country of

citizenship and they agreed to provide that information to the ICE Officers, when they could have refused to answer." Resp. at 16. Officer Holani attests that the arresting officers had probable cause to arrest Petitioners because "A.B.D. and C.C.S., consensually and voluntarily disclosed to the ERO Officers on the scene that they were citizens of foreign countries and that they had no legal basis to be present in the United States." Holani Decl. ¶¶ 7, 10, 11.

But Petitioners' warrantless arrests were in fact improper because neither was made with probable cause. *See* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(i)–(ii) (setting out requirements to effect a warrantless arrest). Petitioners' arrests thus violated the INA; the APA, 5 U.S.C. § 706(2)(b)&(c); and the Fourth Amendment.

In contrast to Respondents' assertions, "[a]s a general rule, it is not a crime for a removable [noncitizen] to remain present in the United States." *Arizona v. United States*, 567 U.S. 387, 407 (2012) (citing *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1038 (1984)). "If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent." *Id.* "When [a noncitizen] is suspected of being removable, a federal official issues an administrative document called a 'Notice to Appear.'" *Id.* (citing 8 U.S.C. § 1229(a); 8 C.F.R. § 239.1(a)). "The form does not authorize an arrest." *Id.* "Instead, it gives the [noncitizen] information about the proceedings, including the time and date of the removal hearing." *Id.* (citing 8 U.S.C. § 1229(a)(1)).

It is well-established that "[t]he Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional

arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). Under the Fourth Amendment, "a fair and reliable determination of probable cause" must be provided "as a condition for any significant pretrial restraint of liberty." *Baker v. McCollan*, 443 U.S. 137, 142 (1979).

Generally, ICE officers making civil immigration arrests must have an administrative warrant. *Arizona*, 567 U.S. at 407–08. "If no federal warrant has been issued, those officers have more limited authority." *Id.* at 408. Under the INA, an officer may conduct a warrantless immigration arrest only if the officer "has reason to believe" that (1) "the alien so arrested is in the United States in violation of any . . . law or regulation[]," and (2) "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); *see also* 8 C.F.R. § 287.8(c)(2)(i)–(ii) (providing that "an arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States," and "that the person is likely to escape before a warrant can be obtained"). "Though 8 U.S.C. § 1357(a)(2) uses the phrase 'reason to believe' as the standard for executing warrantless civil immigration arrests, 'aliens in this country are sheltered by the Fourth Amendment in common with citizens,' and therefore, to avoid running afoul of the Fourth Amendment, this statutory phrase is 'considered the equivalent of probable cause.'" *Escobar Molina v. U.S. Dep't of Homeland Sec.*, ___ F. Supp. 3d ___, No. CV 25-3417 (BAH), 2025 WL 3465518, at *13 (D.D.C. Dec. 2, 2025) (quoting *Au Yi Lau v. U.S. Immigr. & Naturalization Serv.*, 445 F.2d 217, 222–23 (D.C. Cir. 1971)); *see also*

*Tejeda-Mata v. Immigr. & Naturalization Serv.*, 626 F.2d 721, 725 (9th Cir. 1980) ("The phrase 'has reason to believe' [in § 1357] has been equated with the constitutional requirement of probable cause."); *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975) ("The words [in § 1357] of the statute 'reason to believe' are properly taken to signify probable cause."). In sum, to establish probable cause to make a warrantless civil immigration arrest, an ICE officer must satisfy both prongs of § 1357(a)(2).

To meet the first prong, an ICE officer must have "reason to believe," based on that officer's individualized assessment, that an individual "is in the United States in violation of any . . . law or regulation." *See* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(i)–(ii). Here, Holani was not present at the time that officers made an individualized assessment that A.B.D. or C.C.S. were each present in the U.S. in violation of any law or regulation. *See* Holani Decl. ¶ 6. (attesting that "[Holani] and other officers chased and caught the [fleeing] front [seat] passenger" and that "[Holani's] supervisor and other ICE officers remained at the van to secure the scene and the rest of the passengers"). And Respondents submit no testimony or documentation from the officers who purportedly made the individualized assessments that A.B.D. and C.C.S. were in the U.S. in violation of any law or regulation. Holani attests that she and other officers gave orders in English and Spanish, *id.* ¶ 5, and that A.B.D. and C.C.S. "consensually and voluntarily disclosed to the [ICE] Officers on the scene that they were citizens of foreign countries and that they had no legal basis to be present in the United States," *id.* ¶ 7. But Petitioners

do not speak English, and they understand only very basic Spanish. A.B.D. and C.C.S. attest that, from what they understood, they were not asked any questions about who they were or about their immigration status. A.B.D. ¶ 8; C.C.S. ¶ 11. Holani's testimony is not based on personal knowledge and is not credible.

To meet the second prong, an ICE officer must have "reason to believe," based on that officer's individualized assessment, that an individual is a flight or an escape risk. *See* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(i)–(ii). "[T]hat an immigration officer must have probable cause of flight risk 'is not mere verbiage.'" *Ramirez Ovando v. Noem*, ___F. Supp. 3d.___, No. 1:25-cv-03183-RBJ, 2025 WL 3293467, at *2 (D. Colo. Nov. 25, 2025) (quoting *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 889 (S.D. Ohio 2016), and citing *Arizona*, 567 U.S. at 394.) "Nor can it be the case that, simply by being potentially removable, an alien must be deemed to be likely to evade detention by ICE. Such a reading would render the limitations on warrantless arrest created by . . . § 1357(a)(2) meaningless." *Escobar Molina*, 2025 WL 3465518, at *14 (quoting *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1007 (N.D. Ill. 2016)). "Indeed, such a conflation . . . would run counter to the Supreme Court's instruction that the likelihood-of-escape requirement be seriously applied to cabin 'officers [to a] more limited authority' where 'no federal warrant has been issued.'" *Id.* (quoting *Arizona*, 567 U.S. at 408).

Under the INA, "ICE officers must make a 'particularized inquiry' that the subject is likely to abscond." *Ramirez Ovando*, 2025 WL 3293467, at *2 (quoting *Moreno,* 213 F. Supp. 3d at 1007–08). "Courts have . . . made the self-evident finding

that the likelihood of escape is lower when the individual has resided in the country for a lengthy period of time and has strong community ties." *Escobar Molina*, 2025 WL 3465518, at *13. *See, e.g.*, *United States v. Kahn*, 324 F. Supp. 2d 1177, 1186–87 (D. Colo. 2004) (no flight risk where noncitizen worked two jobs, owned a vehicle, paid rent, and never experienced legal trouble before his immigration arrest); *Pacheco-Alvarez*, 227 F. Supp. 3d at 890 (no flight risk where noncitizen had a stable job, lived with his fiancé, and helped pay her rent and raise her two children); *United States v. Bautista-Ramos*, No. 18-CR-4066-LTS, 2018 WL 5726236, at *7 (N.D. Iowa Oct. 15, 2018) (no flight risk where ICE encountered noncitizen at his place of employment, "a place he routinely visited," as opposed to anywhere near the border or heading in that direction).

Here, Respondents also do not meet the second prong required to effect a warrantless arrest. Again, Holani was not present when the purported individualized assessments were made, and Respondents provide no testimony or documentation to support that any flight risk determination was made. Given the language barrier, it is unlikely that such determination could have been made without a Mam interpreter. Finally, as set out above, the facts support that neither A.B.D. nor C.C.S. is a flight risk. Respondents thus violated the INA, the APA § 706(2)(b)&(c), and the Fourth Amendment because they arrested Petitioners without probable cause.

Respondents contend that the unlawful warrantless arrests are not reviewable under the APA because the arrests do not constitute final agency actions.

Respondents appear to argue that Petitioners will not be subject to final agency action until they receive orders of removal. Resp. at 21 ("[T]here is no allegation in the Petition that any final agency action has occurred and Petitioners have no order of removal as they have yet to appear in immigration court.").

Only final agency actions are subject to APA review. *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 867–68 (9th Cir. 2022). An agency action is final when two conditions are met. *Id.* First, "the action must 'mark the consummation of the agency's decision-making process[,]'" and, second, "it must also determine 'rights or obligations' or be one 'from which legal consequences will flow.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). In applying this test, courts consider "whether the action amounts to a definitive statement of the agency's position, whether it has a direct and immediate effect on the day-to-day operations of the subject party, and if immediate compliance . . . is expected." *Prutehi Litekyan: Save Ritidian v. Dep't of Airforce*, 128 F.4th 1089, 1108 (9th Cir. 2025) (cleaned up).

Here, the arrests constituted final agency actions. The arrest decisions and the detention decisions were final. There remained no further agency decision-making, no pending process by which Respondents could review or appeal those decisions. And there can be no doubt that the arrests and resulting detentions had a direct and immediate effect on Petitioners and that immediate compliance was expected. But for the habeas petition, Petitioners had no remedy to address the legality of their arrests, detentions, and continued custody. The arrests thus constituted final agency actions that were unlawful because they were conducted

contrary to constitutional right in violation of 5 U.S.C. § 706(2)(b), and they exceeded Respondents' statutory authority under 8 U.S.C. § 1357(a)(2) in violation of 5 U.S.C. § 706(2)(c).

In sum, ICE officers violated Petitioners' Fifth Amendment due process rights by detaining them and holding them in custody without any pre-deprivation notice or hearing, and they executed unlawful warrantless arrests that violated the INA, the APA, and Petitioners' Fourth Amendment rights.

## CONCLUSION

For the reasons explained above, the Court GRANTS the petition for a writ of habeas corpus as to A.B.D. and C.C.S., ECF No. 1.  The Court ORDERS the following relief:

1. Respondents are to immediately release Petitioners from all custody measures;

2. Respondents are to remove Petitioners' ankle monitors;

3. Respondents are to remove Petitioners from ICE's Intensive Supervision Appearance Program ("ISAP");

4. Respondents are to release Petitioners on parole and subject to reasonable conditions as established by 8 U.S.C. § 1226(a) and implementing regulations;

5. Respondents shall return A.B.D.'s passport to him.

It is so ORDERED and DATED this __22nd__ day of January 2026.


                                   /s/Ann Aiken
                                  _____
                                  ANN AIKEN
                                  United States District Judge